FILED

05/12/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2020 Session

**STATE OF TENNESSEE v. CLARENCE WILLIAM GROVES**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-568      Mark J. Fishburn, Judge**
_____

**No. M2019-00536-CCA-R3-CD**
_____

The Davidson County Grand Jury indicted the defendant, Clarence William Groves, for aggravated child abuse resulting in serious bodily injury (Count 1), aggravated child abuse by use of a deadly weapon or dangerous instrumentality (Count 2), aggravated child neglect (Count 3), and criminal impersonation (Count 4). On the first day of trial, the defendant entered a guilty plea to the misdemeanor criminal impersonation charge in Count 4. Following a jury trial, the defendant was convicted as charged in Counts 1 and 2 and was convicted of the lesser included offense of child neglect in Count 3. Thereafter, the trial court imposed an effective sentence of twenty-one years for all four counts. On appeal, the defendant argues: (1) the State violated his Fifth Amendment right to remain silent; (2) the State committed prosecutorial misconduct during its closing arguments; and (3) the evidence is insufficient to sustain his convictions. We affirm the judgments of the trial court in Counts 1, 2, and 3; however, because the record shows that the defendant entered a guilty plea to the criminal impersonation charge in Count 4, we dismiss for lack of jurisdiction the portion of the defendant's appeal challenging the sufficiency of the evidence supporting that conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part; Appeal Dismissed in Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Manuel B. Russ (on appeal), Nashville, Tennessee, for the Defendant-Appellant, Clarence William Groves.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the serious injuries suffered by five-month-old K.C., the victim, while he was in the care of his father, the defendant. A summary of the evidence presented at trial that is relevant to the issues on appeal follows.

**Trial.** Asya Collier testified that her son was the victim in this case, and the defendant was the victim's father. Immediately after the victim's birth in February 2010, the defendant was not a part of the victim's life and did not live with her, although he later visited with the victim in her presence. Collier said that although the victim generally went to day care, the defendant spent the night with her and the victim on August 4, 2010, and then, the defendant kept the victim for the first time on his own at her home the following day, August 5, 2010, while she worked. She said that when she left for work on August 5, 2010, the victim did not have any injuries.

When Collier returned home the afternoon of August 5, 2010, the victim was asleep in his crib, and the defendant was in the same room watching television. She noted that the victim was wearing pajama pants, which he had not been wearing when she left for work that morning. Collier said she did not notice the victim's injuries when she entered the room because the light was turned off and the victim was lying on his side, which prevented her from seeing his bruises. She did not wake the victim because the defendant said the victim had just fallen asleep. Collier spent approximately ten minutes talking to the defendant in the bedroom, and the defendant never said anything to her about the victim's condition. She and the defendant then went downstairs and talked for another ten minutes. During these conversations, the defendant told her that the victim had vomited earlier and that he had washed the sheets. The defendant, before leaving her home, volunteered to take out her trash, even though he had never taken her trash out before. Approximately fifteen minutes after he left, the defendant called and left Collier a voicemail, stating, "Hey I meant to tell you I was downstairs cleaning the kitchen, wiping the counters and [the victim] was in his highchair . . . " before the message stopped recording. Collier believed that the voicemail ended abruptly because the defendant's cell phone battery died.

After receiving this voicemail message, Collier checked on the victim. When she turned on the light to the bedroom, she saw the bruises on the victim's face. Then she then looked at the victim's entire body and observed "the bruising on the back of his legs and the bruising where his private area was." She also noticed that the victim also had an abrasion to his lip and an injury to one of his ears. At the time, the victim was "moaning, like he was in a lot of pain, like he couldn't keep his eyes open, like he was . . . out of it,

in a daze or something." Collier said that before the defendant left her home, he never indicated that the victim was injured.

Collier immediately took the victim to Vanderbilt's Children's Hospital, where the staff examined and intubated the victim and told her they would have to contact the Department of Children's Services and the police. Although she tried to call the defendant several times, he never answered his cell phone. When the hospital staff asked her how the victim got hurt, Collier told them that she "didn't know exactly what happened to him [because] he was with his dad." The staff later told Collier that the victim had blood on his brain. Thereafter, the victim had ten seizures in two days, received treatment in the Intensive Care Unit for four days, and was hospitalized for more than a week. Collier believed that if she had not received the voicemail message from the defendant, the victim would have died. Collier identified numerous photographs depicting the victim's extensive injuries to his face, legs, and groin area.

Collier said that three days after discovering the victim's injuries, she texted the defendant at the request of Detective Chris Polk, who had been assigned to the case. She said that initially, the defendant did not respond to her texts asking him what he had done to her son. Collier asked, "Did you shake my baby? Did you burn him?" The defendant eventually replied, "I wouldn't do that." She said the only explanation the defendant ever offered for the victim's injuries was that the victim had "scratched the back of his legs on the highchair." However, Collier said that the victim had never before been injured while sitting in his highchair and that she did not believe that any of the victim's injuries could have been caused by the highchair.

When Collier texted the defendant that Detective Polk wanted to talk to him, the defendant replied, "[H]e don't wanna talk to me." She said that the defendant never came to check on the victim while he was hospitalized and that the defendant claimed he was afraid to come to the hospital because Collier's family had threatened him. However, the defendant continued to text her to check on the victim's condition and diagnosis, although Collier never responded to these messages.

Collier said that around September 26, 2010, she informed the defendant that he had an outstanding arrest warrant and asked him to come to her house. When the defendant arrived at her home, the police arrested him, and the defendant gave the officers a fake name and lied about his social security number. Collier said that other than claiming that the highchair caused the marks on the victim's legs, the defendant never provided any explanation for the victim's injuries. She said that although the defendant tried to persuade her not to come to his preliminary hearing, she testified against him at the hearing.

Collier said the victim needed physical therapy for years after being released from the hospital and that because of his injuries, the victim only began walking when he was sixteen months old and only began talking when he was nearly two years old.

On cross-examination, Collier said that prior to the August 5, 2010 incident, the victim had gone to the hospital only two times—on the first occasion, the victim went to the emergency room for "croup" and was released the same day, and on the second occasion, the victim was hospitalized overnight so he could receive a breathing treatment. Although Collier acknowledged that the victim's health had improved by the time of the defendant's trial, she asserted that the victim still had developmental delays and was still taking seizure medication. She also said that the victim continued to receive physical therapy, speech therapy, and occupational therapy and that she had been forced to quit her job and school so she could take care of her son. Collier said that she still did not know what happened to the victim and that the defendant had always denied hurting the victim.

Travis Davidson, a Metro Nashville police officer, testified that he took the defendant into custody for the outstanding arrest warrant for the aggravated child abuse of the victim that Detective Polk had initiated. Officer Davidson stated that at the time of this arrest, the defendant provided him with false information about his identity and date of birth, which prompted him to charge the defendant with criminal impersonation.

Dr. Derek Williams, an expert in field of pediatrics and a pediatrician at the Vanderbilt Children's Hospital, testified that on August 6, 2010, the day after the victim was admitted, he was asked to examine the victim because of concerns that the victim had been abused or neglected. Dr. Williams' said his examination revealed that the victim had both conjunctival and retinal hemorrhaging in both eyes. In addition, the victim had an abrasion at the corner of his lip on the left side, a dark bruise on the left side of his face beneath his left eye and cheek, and some redness and a dark bruise on his right ear. The victim also had some skin abrasions just below his belly button as well as "patterned linear parallel abrasions on the backs of the thighs on both legs" that appeared "to be recent" because they had not yet begun to heal. Dr. Williams opined that the victim's dark bruises were from injuries "within the last day or two."

Dr. Williams said a computed tomography (CT) scan performed the day of the victim admission to the hospital showed that the victim had blood on his brain on both sides, which indicated that he had suffered significant trauma to his head. A second CT scan showed some new blood on the victim's brain, which indicated that the victim's head trauma was "a new injury." Dr. Williams asserted that victims of head trauma often

vomit or have seizures. He noted that Collier said the victim had "vomited" before arriving at the hospital, "had a depressed level of consciousness," and was only "minimally responsive" to things like being stuck with a needle at the hospital, which all indicated that the victim had sustained a recent head injury. Dr. Williams said the last CT scan of the victim's brain indicated a recent trauma because there were changes in the character of the blood on the brain and there were no new areas of bleeding. He explained that in order to cause the bleeding on the victim's brain, "there would have to be sufficient force applied to the skull or to the brain to lead to some tearing of blood vessels in the brain [.]"

Dr. Williams said that the victim's retinal hemorrhages were generally associated with "shaken baby syndrome," which can be caused by either a shaking motion or shaking with some type of blunt impact trauma. He said that shaking an infant can cause a "she[a]ring force" that leads not only to a "tearing of those blood vessels" in both the brain and the retina but also to a "tearing . . . of the brain tissue itself." He asserted that these types of injuries would not result from normal household activities, like picking up or jostling the infant. Instead, he said that a "more violent shaking type of motion" would be necessary to cause the injuries associated with shaken baby syndrome and that such injuries could result when someone throws an infant down or when someone inflicts a blow to an infant's head. Dr. Williams also opined that the bruise below the victim's left eye and the bruise inside the victim's right ear were caused by two different mechanisms or impacts.

When asked about the cause of the injuries to the back of the victim's legs, Dr. Williams opined that "something that was linear in nature . . . struck the child" because the injuries were "fairly thin, so something, some type of thin object . . . had a forceful impact on the [victim]'s leg." He also asserted that these injuries, which numbered four on one leg and two on the other leg, were from multiple impacts that had been recently inflicted. In addition, he asserted that the multiple injuries to the victim's groin were caused by more than one impact and were recent. Dr. Williams said the groin and leg injuries could have been caused by a coat hanger, extension cord, or the edge of a ruler. He also opined that these injuries were independent and separate from the injuries to the victim's head and that he could not conceive of a mechanism whereby the victim would have sustained all of his injuries from a single incident. Dr. Williams also asserted that a highchair could not have caused the injuries to the victim's legs and groin area. He concluded that all of the victim's injuries were recent because there were no signs of healing.

Dr. Williams stated that the victim, while hospitalized, began having seizures because of his brain injuries. He said that an untreated seizure could cause death or

developmental problems and that the victim had been prescribed medication to control his seizures, even after his discharge from the hospital. He also stated that the victim, following his release from the hospital, was treated by a speech and language pathologist because of his ongoing speech delays and was seen by a physical therapist because of his problems with gross motor function, which were likely the result of his brain injuries. Dr. Williams reiterated that the victim's injuries were not the result of an accident. He said he was unable to think of a non-inflicted mechanism that was capable of producing the number and variety of injuries to the different areas of the victim's body.

On cross-examination, Dr. Williams acknowledged that some of the victim's wounds showed superficial scabbing, which was the first sign of healing. He agreed that the victim could have received these injuries a couple of days before he examined the victim in the hospital. Although Dr. Williams believed that the new blood on the right side of the victim's brain indicated a single injury, he conceded that it was possible that the final CT scan possibly showed an old brain injury on the right side. When asked whether the victim's head injuries, when viewed in isolation, could have been caused by an accident, Dr. Williams replied that it was "unlikely, but possible." He also acknowledged that it was "possible" the victim's bruises and internal injuries could have been caused by a fall.

On redirect examination, Dr. Williams clarified that superficial scabbing happens very quickly in children. He said the victim's scabbing was very difficult to observe in the photographs that were admitted at trial and that he had not documented the existence of any scabbing in his report. He also noted that the absence of scabbing on the victim's other linear marks indicated that those injuries were even more recent. In addition, Dr. Williams explained that the CT scans showed new bleeding on both sides of the victim's brain, which led the team at Vanderbilt to conclude that the victim had suffered recent injuries to the left and right side of the brain. Although Dr. Williams acknowledged that a brain bleed could be caused by a fall, he said that "retinal hemorrhage[s] very rarely can be caused by a fall," explaining, "More commonly . . . with falls, . . . you see skull fractures, a single-point of impact, a single injury, and it's rare to see bilateral subdural hemorrhage[s], it's rare to see bilateral retinal hemorrhages from a single fall." Instead, he said a fall would produce bleeding on one side of the head at the point of impact. Dr. Williams concluded that the multiple injuries to the victim's brain were more consistent with "abusive head trauma" because there were "multiple sites of injury, multiple areas of potential impact."

During recross examination, Dr. Williams asserted that the new bleeding on the victim's brain indicated "a very recent injury." However, he admitted that he was unable to pinpoint the exact time the victim sustained his brain injury.

- 6 -

The defendant testified in his own behalf at trial and asserted that he did not intentionally hurt his son. He said that he had never before testified about the August 5, 2010 incident involving the victim. He also said that, aside from discussing the incident with his own attorney, he had never talked to law enforcement, anyone associated with law enforcement or the Department of Children's Services, or anyone else about the August 5, 2010 incident involving the victim. He acknowledged that he had a prior felony drug conviction.

The defendant said that although he had visited with the victim many times, August 5, 2010, was the first time Collier had allowed him to keep the victim on his own. While the defendant acknowledged that the injuries to the back of the victim's legs and to the victim's groin area occurred while the victim was in his care, he denied inflicting these injuries. Instead, the defendant asserted that the victim sustained his injuries when he accidentally fell down the stairs while holding the victim as he was trying to get them out of Collier's smoke-filled apartment.

The defendant said that the morning of August 5, 2010, he fed the victim a bottle and placed him on Collier's bed, and when the victim vomited approximately twenty minutes later, the defendant washed the sheets. A little after 2:00 p.m., the defendant placed a frozen pizza in the oven to bake before going back upstairs and falling asleep. He awoke when the apartment's smoke detector went off, and he saw that there was "smoke everywhere." The defendant immediately realized that he had overslept and that the pizza had burned in the oven. He said that his first instinct was to grab the victim and exit the apartment because he had cooked the pizza in a gas oven and was afraid it would explode because of the fire. The defendant said he picked up the victim and, as he was rushing down the concrete steps from the second floor of the home, he tripped and fell while holding the victim. At the time of this fall, he was only three or four steps from the top, so he fell most of the way down the staircase. The defendant said, "I end[ed] up with . . . my legs kind of over top of me and I end[ed] up landing back on my shoulder at the bottom, but my son he end[ed] up being up against the door because the front door is parallel to the stairs." The defendant was unable to say whether the victim had been thrown from his arms or flew out of his arms, only that he fell on top of the victim as they were tumbling down the stairs. The defendant said he became "dazed" when he hit his back during the fall and that he "still had pain" and a "knot" on his back from this injury. He believed the victim made contact with the stairs before the victim hit the concrete floor near the door. The defendant said that when he realized the victim was by the door, he "went into panic mode[.]" He rushed over, picked up the victim, who was crying, and went out the front door of the apartment. When he got outside, he noticed that the victim had a "busted lip," but he did not further examine the victim, who continued to cry. The

defendant stayed outside with the apartment door open for approximately twenty minutes to let the smoke clear. When the smoke finally cleared, he went back inside Collier's apartment. He threw the burnt pizza in the trash can and opened the back door and windows to the apartment.

The defendant said that the victim eventually stopped crying before they reentered the apartment. At the time, he did not notice any bruises to the victim's face and believed the victim was physically fine, aside from the injury to his lip. The defendant said that he considered seeking medical attention for the victim but "made a very, very stupid decision and decided that [he] thought [the victim] was okay." He also admitted that he did not seek medical attention for the victim because he did not want Collier to think he was "an incompetent father" and did not want Collier to tell him he could no longer care for his son on his own.

The defendant said that after returning to the apartment, the victim stayed up for a little bit and then fell asleep just before 5:00 p.m. He said he did not observe anything unusual about the victim when he slept. The defendant said that when Collier returned home around 5:30 p.m., she smelled smoke, and he told her that he had burned a pizza in the oven. He and Collier talked for approximately ten minutes, and when the victim began to stir and move, he suggested that they go downstairs so they would not wake him. Once they got downstairs, they talked for another twenty minutes. He said they discussed his burning the pizza, and he said the pizza was in the trash can and offered to take out the trash. The defendant said he left Collier's home but felt bad about not telling her about his fall with the victim, so he tried to call her before getting on his bus to go home. He began leaving her a voicemail, but before he could get "into every detail" of what happened, his cell phone battery died. The defendant said he was unsure when his voicemail was cut off. He also said that because his phone charger was broken, he was unable to charge his cell phone until around noon the next day, when someone bought him a new charger. When his phone was finally operational, he realized he had received "[o]ver twenty" voicemails from Collier's family members, who threatened to hurt him because they claimed he had beaten his son. The defendant said he took these threatening messages seriously. He also received a phone call from Collier, who accused him of beating the victim and informed him that the victim was hospitalized. During this call, Collier told him that the victim had scratches on his legs and had a bruise on his face, and the defendant replied that he had not beaten the victim and that he would never intentionally hurt his son. The defendant said he received several more threatening messages from members of Collier's family over the next four or five days.

When asked if Collier told him about the victim's condition, the defendant replied, "Yes, she told me, and I was I—immediately, you know, I don't know, I should have told

- 8 -

[Collier] right then and there what actually what had happened—what actually did happen, but the only thing I could think of was by everyone saying that they were going to do this to me and that I had beat my son, I felt like I had to defend myself to try to prove—well, I didn't try to prove, but I was telling them that I didn't [beat him]." The defendant denied ever beating or hitting the victim. He also denied seeing any marks on the victim's groin area when he changed the victim's diaper on August 5, 2010; however, he asserted that the light in the bedroom was dim when he changed the victim's diaper. The defendant said he talked to Collier about visiting the victim at the hospital several times but he never actually went to see the victim because of the threats he had received from Collier's family. He said although he told Collier to let him know when her family was no longer at the hospital so he could come see the victim, Collier never told him when her family left. He claimed that when he first learned that the victim was in the hospital, he and Collier communicated every day, even though Collier testified that she did not text him until three or four days after the victim had been moved into a regular hospital room. The defendant said that during his August 6, 2010 conversation with Collier, she continued to accuse him of beating his son and specifically mentioned the victim's leg scratches and facial bruises, and the defendant denied doing anything to hurt the victim. He said that approximately two weeks after August 5, 2010, Collier stopped responding to his calls and texts. Before she stopped responding, Collier continued to accuse the defendant of hurting the victim based on the information the doctors had given her.

When the defendant was asked why he did not tell Collier about his fall with the victim, he replied, "I was still being stubborn and being scared . . . of her reaction." The defendant then asserted that Collier called him in July 2010 to tell him she had taken the victim to the hospital that day after Collier's aunt dropped the victim, which caused the victim to hit his head on the concrete. The defendant said that by the time Collier was able to get in touch with him, she and the victim were back at home and she said the victim was "okay."

The defendant acknowledged that at some point after the August 5, 2010 incident, Collier finally began responding to his texts, and he asked her to send him a picture of the victim. He said that at the beginning of September 2010, Collier allowed him to come to her apartment, although she would not let him see the victim. He said that during this visit, the victim was at his grandmother's house, and he and Collier engaged in sexual relations. At the time, the defendant knew that Collier still believed he had beaten his son, but they did not talk about what happened to the victim on August 5, 2010. The defendant said that after this visit, he and Collier talked at least every other day. He said Collier gave him Detective Polk's phone number and told him that the detective wanted to talk to him, but he never spoke to him. The defendant said he called Detective Polk

- 9 -

one time and then hung up, and when Detective Polk called him back, the defendant did not answer because he was "scared" he would have to go to jail and would not be able to be around the victim or his daughter from a different relationship. He said he received one message from Detective Polk asking him to call him back. Upon receiving Detective Polk's message, the defendant told Collier, "I don't think I need to speak to him at this time because . . . they're thinking that I abused my son, and I'm trying to see how he is and I'm not, I was fearful of coming to jail."

The defendant said that on September 24, 2010, approximately two weeks after their early September 2010 encounter, he called Collier, who told him that he had an outstanding arrest warrant and that he should not disclose their recent talks or sexual intercourse to law enforcement because she was afraid the victim might be taken from her. The defendant said he initially agreed not to say anything because Collier loved her son very much. When asked why he called Collier on September 24, 2010, the day of his arrest, the defendant said, "Because I had, I was, in my mind I was sick and tired of being accused, I was sick and tired of hiding the fact about the accident, and I wanted to come clean[.]" He said he texted Collier and told her they needed to talk about the victim, and Collier finally agreed to allow him to come to her home. When the defendant arrived at Collier's apartment at approximately 2:00 a.m., he knew the victim would be there. He said he was going to tell Collier that he had fallen down the stairs while holding the victim. When he arrived, Collier asked the defendant if he had any weapons on his person, and when he said he did not, she allowed him inside. She allowed him play with the victim for approximately three or four minutes before the police arrived. The defendant explained, "I didn't know that I was being set up and I wanted to come clean[.]" He said he was happy to see his son and did not want that to end, so he gave the officers a fake name with the hope that he could "slip through the cracks and get by if they didn't know [his] real name." He said he did not think that Collier had notified the police that he was coming to her home because she had told him the day they had sexual relations that she would never set him up.

The defendant acknowledged that he had not had any contact with Collier since the day of his arrest. However, he asserted that he had tried to call Collier after his arrest to tell her what happened with the victim, but Collier never answered her phone. He claimed he still wanted to be a part of the victim's life and to be a father to the victim. The defendant insisted that he did not intentionally hurt the victim and that he had accidentally fallen with the victim down the stairs. When defense counsel asked if he refrained from telling Collier about the fall because he was afraid that she would not let him see the victim anymore, the defendant replied, "Yes, but on the night of the arrest I was going to tell her. The three times I've tried to call her after I've been arrested, I was

going to tell her if she would have answered the phone." He asserted that he was never able to speak with Collier after the night of his arrest.

On cross-examination, the defendant admitted that regardless of what the State asked him, he would not admit that his abuse or neglect of the victim caused the victim's serious injuries. He acknowledged that he initially lied in this case to avoid criminal charges. The defendant acknowledged that he was the only person in the apartment with the victim from 6:30 a.m. to 5:30 p.m. on August 5, 2010. When asked about his alleged fall with the victim, the defendant said he could not say exactly when the victim fell out of his arms as he fell down the steps. Although the defendant claimed he experienced "severe pain" when his back hit the stairs, he acknowledged that he never went to a doctor for treatment. The defendant said he knew "for a fact" that he landed on top of the victim as they were falling down the stairs. He estimated that the steps were at least ten feet high and said that he was approximately three feet down them when he fell while holding the victim. He said that he "rolled" down the steps "at least three" times as he fell and that he believed the victim came out of his arms toward the end of the fall. He also said the victim's head hit the steps during the fall The defendant stated that he was in a "daze" after the fall and did not know how long the victim had been lying on the floor before the victim started crying.

The defendant said he picked up the victim, took him outside, and then checked the victim for injuries. He noticed that the victim had a "busted lip," but he did not see the victim's "facial bruise at that point in time." The victim continued to cry for four or five minutes before he was able to console him. The defendant said he waited outside approximately twenty minutes for the smoke to clear before returning to Collier's apartment. He claimed that Collier's neighbor came out while he and the victim were outside; however, he said his first attorney's investigator told him that unless he knew the name of this neighbor, this information would be useless. When the State suggested that the names of the neighbors living beside Collier should have been available because Collier lived in government housing, the defendant replied, "[T]hat's not my job to find that out. I don't have no way of doing that." When the State said this was "the first time we're actually hearing that story [about the fall] is today in court, right?," the defendant insisted that he informed his first attorney and her investigator of "everything" when he got bound over to the grand jury.

The defendant, turning back to the events on August 5, 2010, said that after waiting outside for twenty minutes, he and the victim went back inside Collier's apartment, and he placed the victim on the couch and opened the doors and windows for the smoke to clear. He said he picked up the victim from the couch and placed him in his highchair while he cleaned the burnt pizza out of the oven. The defendant admitted that

- 11 -

he had run with the victim out of the apartment because of his concern that Collier's gas stove might explode; however, he said he "thought it would be okay" to take the victim back inside the apartment because "the smoke wasn't built up at the time[.]." The State, questioning how the smoke had diminished when no windows had been opened and only one door had been opened and the pizza continued to burn, then asked the defendant, "What part of that story is even remotely close to the truth?" The defendant replied, "It is the truth."

The defendant acknowledged that after they returned to the apartment, the victim was a "little fussy, especially when [he] pulled him out of the highchair." He said he first noticed the victim's scratches when he gave him a bath because of the victim's "busted lip." At that point, he concluded that the scratches must have come from the victim's highchair. He said that during the bath, the victim was "still responsive" but was "a little fussy." The defendant admitted that the injuries to the victim's legs and groin area occurred while the victim was in his care that day; however, the defendant insisted he "didn't inflict them," to which the State retorted, "So you say, another one of your claims to the jury that you want them to believe." The defendant acknowledged that the accidental fall on August 5, 2010, caused the victim's "busted lip, the scratches on the legs, and . . . the bruising on the face and maybe the ear[.]" While the defendant admitted that the victim sustained more than a dozen injuries to his face, ear, lip, legs, groin and head the first day he was left in his sole care, custody and control, he denied inflicting these injuries.

The defendant conceded that he had put the victim in the pajama pants because he was worried that Collier would get "hysterical" if she saw the scratches on the victim's legs. The defendant acknowledged that he lied by omission in failing to tell Collier about the victim's condition before he left her home; however, he claimed that he tried to tell Collier about the accidental fall and the scratches from the highchair when he tried to leave her the voicemail. He also maintained that he told Collier, before leaving her apartment, about the smoke from the burnt pizza. When the State asked why Collier only told Detective Polk that he took he took out the trash, not that he took out the trash because it contained burnt pizza, the defendant replied, "Of course she would leave that out, just like she left the part about us having sex[.]" The defendant admitted that he had no way of proving his claim that he had sexual relations with Collier in September 2010, after the victim came home from the hospital. However, he claimed that if his first attorney had obtained his phone records, they would have shown that he had been talking to Collier during that time.

The defendant said he recalled Collier testifying at his preliminary hearing. When asked if he remembered whether his first attorney questioned Collier about the smoke in

- 12 -

her apartment from the burnt pizza, the defendant replied, "[My attorney] really didn't ask her anything." He also said his first attorney did not ask Collier any questions about whether she and the defendant had sexual relations following the victim's injuries or about the voicemail when he said something happened to the victim from his highchair. When the State asked the defendant why he did not establish some proof at the preliminary hearing to support his claim about this accidental fall, the defendant said he never testified at the preliminary hearing because his attorney "waived [his] rights" and his attorney "told [him] to just sit there and listen." He asserted that it was after his preliminary hearing when he initially told his first attorney that he fell with the victim down the stairs.

Then the following exchange occurred between the State and the defendant:

State:        In three and a half years, . . . you've essentially had this claim of accident being the explanation for your son's injuries that at no point in time ever came and saw the light of day until your testimony this afternoon, correct?

Defendant:   No, that is not correct.

State:        Well, have you ever—

Defendant:   It's just now being known to you, yes, but to my lawyers and detectives, I've been sa[ying] that since day one.

State:        Well, not detectives?

Defendant:   Well, not [Detective] Polk, but the other detectives, yes.

State:        Surprise, right, three and a half years later, new version, new truth?

Defendant:   That's been the version since I seen [my first attorney] on the [September] 29th [at the preliminary hearing].

State:        Okay. And when Detective Polk reached out to you, you of course told him, right?

Defendant:   When did Polk talk to me?

State: Apparently he left a message, right, told you he wanted to speak with you?

Defendant: You talking about over the phone, before my arrest?

State: Uh-huh (affirmative).

Defendant: Yes, he did.

State: You knew you had an explanation for these injuries, right?

Defendant: Yes, I did.

State: You didn't come forward at that point in time?

Defendant: I was scared.

State: You were scared of being arrested for child abuse, right?

Defendant: Not for . . . child abuse, I wanted to be able to . . . get it known that I didn't do it.

State: Well, how would that happen if you sat on this for three and a half years, Mr. Groves?

Defendant: Well, I was trying to . . . explain it to Ms. Collier.

State: Did you ever tell Ms. Collier you fell down the stairs with your son?

Defendant: I said—

State: No, right, never?

Defendant: I put it—I didn't say specifically.

State: Never, ever, ever?

Defendant:    Sir, I didn't say it to her specifically, but I did say "why are you accusing me of beating my son when it could have been a fall," and she said "I don't think so."

State:    Mr. Groves, until this afternoon when Ms. Collier heard your version on the stand, she has never heard you explain that you fell down the stairs supposedly with her son, correct?

Defendant:    That was what I was going to explain to her on the night of my arrest

The defendant said he did not tell Collier what happened to the victim the day in September 2010 when they allegedly had sexual relations because he was just going over to her home to have sex with her.

The defendant admitted that he sent numerous text messages to Collier during the victim's hospitalization. In one of the text messages, the defendant said, "I was trying to tell you yesterday before my phone cut off that [the victim's] highchair scratched his back legs yesterday from that buckle on there[.]" The defendant acknowledged that while he said something to Collier about the scratches on the victim's legs from the highchair, he never said anything to her about his fall with the victim down the stairs. When the State asked the defendant why he did not say anything to anyone about the accidental fall with the victim when the victim was in the pediatric intensive care unit and the doctors were trying to figure out what had happened, he stated, "I was scared. I should have, that's the single biggest mistake of my life, I should have told her from the beginning."

The State and the defendant then had the following exchange:

State:    Mr. Groves, Ms. Collier is telling you your son has severe head injuries, he's on a breathing machine, he's got seizures, and you're not saying word one about this so-called fall down the stairs, right?

Defendant:    Right.

State:    Because it never happened?

- 15 -

Defendant:   It happened.

State:   Then why not say that to Ms. Collier, to the doctors?

Defendant:   I never got to talk to any doctors.

State:   Did you pick up the phone and call?

Defendant:   I never had—I never had access.

State:   What kind of father, Mr. Groves, sits miles away while his kid is in the ICU Unit . . . and doesn't say anything about what may have happened to cause his severe head injury? What kind of father does that?

Defendant:   I would say a bad one.

State:   Exactly.  That very kind of father that would cause these injuries in the first place?

Defendant:   No.

State:   Mr. Groves, there was only one reason why you didn't say anything about some so-called fall, because it never happened?

Defendant:   It happened, that's your opinion.

State:   No, Mr. Groves, if it happened that way, there was no reason not to say anything.

Defendant:   I was going to say something.

State:   You never did.  Three and a half years later?

Defendant:   No.  It would, if she would have—if I would have got to explain myself the night of my arrest, she would have known, the three times I tried to call from being in jail, she would have known if she would have answered the phone.

- 16 -

State: Who was treating your baby, Ms. Collier or the doctors?

Defendant: I would say the doctors.

State: Was there anything that prevented you from calling the doctors and saying, I had this big fall down the stairs with my son, you better look into that."

Defendant: Right off the bat I didn't even know what hospital he was at, I just knew he was in the hospital, I didn't know where, I asked her where, and she told me a little while later.

State: You know, Mr. Groves, you keep coming up with one excuse, one rationalization, one justification after another?

Defendant: That's not an excuse.

State: Really?

Defendant: Not an excuse.

State: Then what is your excuse for not calling the doctors and telling them what you claim is the truth about what happened to your son?

Defendant: I was—I wanted to go see my son, I was worried about his welfare. I wanted her to tell me how he was doing, I wanted to see him, but I never got the chance.

State: It was more important for you to protect your own skin than to make sure the doctors had the information [that] might help them treat your son, was it not?

Defendant: That's not accurate all the way.

State: What part of it is inaccurate?

Defendant: The only part that I would say that I could have talked to was the detective.

- 17 -

State:      Oh, you could have told the patrol office[r] that arrested you on September 24[], 2010, right?  You could have told the judge at the preliminary hearing on September 29[], 2010?

Defendant:  If [my first attorney] would have let me, yes.

State:      You could have told anybody?

Defendant:  I did.

State:      Anybody in the six weeks before you got arrested about what happened, but you didn't?

Defendant:  I was being falsely accused, I should have, but I didn't, that's my fault, that's the part I got to regret and deal with every[]day that I have been living with and regretting every[]day.  I mean, with all due respect, . . . sir, I came to jail September 24th with a head full of hair, there's not been a day that I didn't regret or didn't hate myself or didn't have anger at myself or resentment towards myself and I stress myself every single day, you know what I'm saying, all my hair [is] gone from that now, I mean, I wrote, I even have letters that I wrote to Ms. Collier that expressing and there in the jail and my pod where I sleep at right now.

The defendant admitted that in the twenty-three documented text messages he sent to Collier, he never mentioned how the victim came to be injured; however, he claimed that this was because Collier accused him of beating the victim.  When the State asked, "Well, if your being falsely accused, then the easiest way to respond to that is to say what really happened, right?," and the defendant replied, "I should have done that.  I admit it, I admit to that, that was the part that I should have done."  This prompted the State and the defendant to have the following exchange:

State:      And now you hope that this jury is going to buy this version that you're offering, that it's all an accident, it's all a mistake, and stupid me for not saying anything?

Defendant: I don't want them to hope anything. I just want them—their verdict is their verdict, I just want them to hear my side of the story and know what really happened that I'm telling them. It's their verdict to believe or not, that's not on me, that's not what I'm aiming at, I just want my story to be heard.

State: And in all the time before this, through all the opportunities to tell family members, doctors, Ms. Collier, police, that story never was heard, was it?

Defendant: Just like the story that she told me not to tell the police, family and lawyers about that me and her had been seeing each other and we had sex, so that DHS would possible take [the victim] from her.

During redirect examination, the defendant asserted that the preliminary hearing was the first time that he learned about the severity of the victim's injuries, including the victim's brain injuries.

The State, on rebuttal, recalled Collier, the victim's mother. Collier said that upon returning home on August 5, 2010, the defendant never told her anything about a fall down the stairs with her son or about a fire or a pizza burning in the oven. She said there was no odor of smoke in her home that day. In addition, Collier said that the defendant never mentioned anything about a burnt pizza being in her trash and asserted that the defendant took out the trash without giving her a reason. She also said the defendant never said anything to her about cleaning up her kitchen because there had been smoke in her home.

Following the presentation of proof, the jury convicted the defendant of aggravated child abuse in Counts 1 and 2 and the lesser included offense of child neglect in Count 3, and the trial court imposed an effective sentence of twenty-one years. The defendant, with the assistance of trial counsel, filed a timely motion for new trial on August 8, 2014, alleging that the evidence was insufficient to sustain his convictions and that he received an excessive sentence. Following the appointment of successor counsel,[1] the defendant filed an amended motion for new trial on May 22, 2015, alleging that the

---

[1] The record contains no order regarding this appointment.

evidence was insufficient to sustain his convictions and that the trial court erred in allowing the State to comment on his right to remain silent by permitting the State to cross-examine him regarding his failure to inform the victim's mother, medical personnel, or the detectives about his alleged fall with the victim and regarding his failure to testify about this alleged fall at the preliminary hearing.  The trial court denied these motions on August 20, 2015.

On January 22, 2019, successor counsel filed a motion and amended motion for a delayed appeal on the defendant's behalf.  In these motions, successor counsel acknowledged that "it was his neglect that led to [the defendant] never filing a Notice of Appeal in this matter" and asked the trial court to enter an order allowing for a delayed appeal "[i]n order to protect [the defendant's] constitutional due process rights." Successor counsel, recognizing that he "would likely be a witness in regards to this Motion," asked the trial court to "appoint new counsel" for the defendant so that he might proceed with his appeal.  At the evidentiary hearing on these motions, the State conceded that the defendant "[wa]s entitled to a delayed appeal," and the trial court entering an order on March 21, 2019, granting the delayed appeal and appointing appellate counsel for the defendant.  On March 26, 2019, the defendant filed his notice of appeal.

## ANALYSIS

**I.  Right to Remain Silent.**  The defendant contends that the State's cross-examination of him at trial violated his Fifth Amendment right to remain silent.  He asserts that the trial court erred in allowing the State to question him about declining to give a pretrial statement about his accidental fall with the victim to law enforcement, about declining to give a statement about this fall to the physicians treating the victim, and about his decision not to testify about this fall at his preliminary hearing.  The defendant also contends that the State compounded these errors when it commenting during its closing arguments on the defendant's pre-trial silence.  Although the defendant acknowledges that he did not contemporaneously object to the State's line of questioning or argument at trial, he nevertheless asserts that the State's questions and argument regarding his decision to remain silent about this fall amount to plain error.

In response, the State does not argue that the defendant is limited to plain error relief on this issue but does contend that the defendant's right to remain silent was not violated.  Specifically, the State asserts that there was no proof presented to the court that the defendant was given his Miranda rights at the time of his arrest or following his arrest, and that even if he had been given his Miranda rights, the defendant waived his right to remain silent when he admitted on cross-examination at trial that he told "other detectives" about this fall with the victim following his arrest.  See Roosevelt Morris v.

- 20 -

<u>State</u>, No. W2008-01449-CCA-R3-CD, 2010 WL 3970371, at \*13 (Tenn. Crim. App. Oct. 11, 2010) (recognizing the holding in <u>State v. Cockrell</u>, 741 N.W.2d 267, 271 (Wis. Ct. App. 2007), that a State's use of a defendant's post-<u>Miranda</u> silence does not violate due process when the defendant testifies that he cooperated with the police). The State also contends that because "the defendant gave the impression on direct examination that he had always tried to tell his side of the story," the State was "permitted . . . to question him regarding the timing of these statements." Lastly, the State argues that if any error occurred, it was harmless beyond a reasonable doubt in light of the trial court's curative instruction to the jury and the overwhelming evidence of the defendant's guilt, including Dr. Williams' testimony that he could not conceive of single event that would account for all of the victim's injuries. We conclude that the defendant is not entitled to plenary review and that the State's questions and arguments do not rise to the level of plain error.

Here, at the jury-out hearing just prior to the defendant's cross-examination at trial, the State asked if it could take up one issue before the jury was brought back into the courtroom for the beginning of the defendant's cross-examination. The State noted that although the defendant had been in custody for the last three and a half years, the defendant's direct examination at trial was the first time he had told his "story" about the accidental fall down the stairs with victim. The State asserted that it intended to ask the defendant why he had not disclosed this alleged fall during the last three and a half years of his incarceration while awaiting trial, especially in light of defendant's testimony on direct examination that he "wanted the truth to come out" and wanted to "come clean. While the State acknowledged that it generally did not comment on a defendant's decision to remain silent, it argued that the defendant had "opened the door" to this line of questioning in light of the defendant's testimony on direct examination.

The trial court asked about the defense's thoughts on this subject, and defense counsel stated, "[I]n speaking with my client and preparing for this trial, I . . . did not disclose my strategy to [the State]." She said the defendant had "never authorized [her] to share [information concerning the accidental fall] with [the State]" because the offers they had received from the State were for a substantial amount of time in prison and the defendant "did not want to accept [those offers] and wanted to get up here and be able to tell his story and not enter a plea on any of the two abuse counts or the neglect count." Defense counsel acknowledged that she did not "necessarily have an objection to [the jury] knowing [that the defendant had been in custody[.]"

When the trial court noted that the defendant would likely respond to the State's proposed questions by stating that he had informed his attorney about the fall long ago and that he was just now publicly disclosing the fall with the victim, the State replied, "[M]y line of cross-examination is more to the issue of the timing of this going on when

- 21 -

he's been deprived of liberty for three and a half years and he's never volunteered this information at the time of the preliminary hearing or . . . to law enforcement despite that being a claim that obviously went to the merits of the mechanism of how it occurred[.]" The trial court said that while it tended to agree with the State and could address the issue of the defendant being in custody, it was concerned, if it allowed the State's line of questioning, that they would be "treading on possible Fifth Amendment rights that 'I don't have to talk to anybody. I don't have to talk to the police or anything[.]'" The State acknowledged that "there is [a Fifth Amendment] issue if [the defendant] had been Mirandized" but asserted that the defendant had "an absolute right to raise those issues at the time of the preliminary hearing and [during] cross-examination [at the preliminary hearing]" but failed to do so. The State then asserted that the defendant did not "get to hide behind the claim, and force this issue without us being able to at least raise" the question of why the defendant was only now disclosing the alleged fall with the victim. The State also said that the defendant "can say that he came forward to his lawyers at whatever point in time that he wants to say with this story" but that the prosecution should be able to question him about his failure to provide the accidental fall explanation to anyone until his trial because it relates to the defendant's "credibility." At that point, the trial court stated:

> I think the credibility issue is—that's where I think it's got significant weight due to the fact that he claims—his testimony is clear that the reason I didn't come forward and say anything, I was afraid of being arrested. Now he's been arrested, the consequences have happened and he still never came forward, I fully understand and accept the credibility angle of it. The custody issue to me is not a significant issue. Those things come up, I think [the jury will] realize that on serious and significant cases that there's a good chance the person may be in jail because they can't afford the bond, so I mean sometimes it works to their advantage. But my only concern is, yes, he has a right to bring it up at the preliminary hearing, but he has an absolute equal right to stand on his Fifth Amendment [right to remain silent], that's my only concern."

Defense counsel replied, "I think that's my main issue with it as well, yes, this is the first time he's come forward and publicly told this, told what happened." The trial court specifically noted that the "Fifth Amendment doesn't apply to anybody . . . but police and custody interrogations" and does not apply to "family, friends, neighbors, [or] Ms. Collier." Defense counsel stated, "Right, but he didn't have to come forward and tell this

to, as you said, law enforcement or anyone that was investigating the case." At that point, the trial court stated:

> But I think it also goes to another credibility issue [regarding] his concern for his child that he wouldn't even let the medical personnel know what happened so that they could make sure they were properly treating the child. But there's a significant credibility issue and once he takes the stand, his credibility is a key component of the trial.

Defense counsel replied, "Yes, sir, [the defendant] understands that." At that point, the trial court made the following ruling:

> So, I'm going to allow [the State] to do that, I will, when you do that, give a curative instruction to the jury, not only as to him being in jail, but that he also has a Fifth Amendment right not to incriminate himself or give any statement in relation to possible criminal charges. You can give what weight, you know, you can weigh his election to exercise that [right] along with the other reasons he's given, but you cannot hold it against him solely because of—I'll come up with a way to put it to where his Fifth Amendment rights, [the jurors] understand that he can keep his mouth shut as it relates to incriminating himself with police.
>
> . . . .
>
> I've got to have something on the record about that, that's my bigger concern, particularly after [the defendant] gets counsel, I don't know what the attorneys advised him, but when I was in private practice I always told my clients to keep [their] mouth[s] shut [because talking to law enforcement is] usually what gets you convicted

In response to this ruling, defense counsel stated, "I wasn't on the case until well after the prelim[inary hearing], but I have no idea what [defendant's previous counsel's] advice was, but of course mine was to speak to me."

- 23 -

On appeal, the defendant complains about the State's questioning of him at several points during cross-examination. First, the defendant argues that the State improperly commented on his right to remain silent when it asked the following questions:

State:          So, you had an opportunity at that point in time to get right on top of the accusation and establish some proof that might support your story that this all happened, right?

Defendant:   Yes, from what I was told, [my first attorney] told me to just sit there and listen, I mean.

State:          Did you testify at the preliminary hearing, sir?

Defendant:   She waived my rights.

State:          Did you testify at the preliminary hearing?

Defendant:   No, I didn't get a chance to, she waived my right.

State:          So you didn't get up and talk about this so-called fall down the stairs as an explanation for these injuries, correct?

Defendant:   That's correct.

The defendant also complains about this line of questioning:

State:          In three and a half years, . . . you've essentially had this claim of accident being the explanation for your son's injuries that at no point in time ever came and saw the light of day until your testimony this afternoon, correct?

Defendant:   No, that is not correct.

State:          Well, have you ever—

Defendant:   It's just now being known to you, yes, but to my lawyers and detectives, I've been sa[ying] that since day one.

State:          Well, not detectives?

Defendant: Well, not [Detective] Polk, but the other detectives, yes.

State: Surprise, right, three and a half years later, new version, new truth?

Defendant: That's been the version since I seen [my first attorney] on [September] 29th [at the preliminary hearing].

State: Okay. And when Detective Polk reached out to you, you of course told him, right?

Defendant: When did Polk talk to me?

State: Apparently he left a message, right, told you he wanted to speak with you?

Defendant: You talking about over the phone, before my arrest?

State: Uh-huh (affirmative).

Defendant: Yes, he did.

State: You knew you had an explanation for these injuries, right?

Defendant: Yes, I did.

State: You didn't come forward at that point in time?

Defendant: I was scared.

State: You were scared of being arrested for child abuse, right?

Defendant: Not for . . . child abuse, I wanted to be able to . . . get it known that I didn't do it.

State: Well, how would that happen if you sat on this for three and a half years, Mr. Groves?

Defendant: Well, I was trying to . . . explain it to Ms. Collier.

- 25 -

State:          Did you ever tell Ms. Collier you fell down the stairs with your son?

Defendant:     I said—

State:          No, right, never?

Defendant:     I put it—I didn't say specifically.

State:          Never, ever, ever?

Defendant:     Sir, I didn't say it to her specifically, but I did say "why are you accusing me of beating my son when it could have been a fall," and she said "I don't think so."

State:          Mr. Groves, until this afternoon when Ms. Collier heard your version on the stand, she has never heard you explain that you fell down the stairs supposedly with her son, correct?

Defendant:     That was what I was going to explain to her on the night of my arrest.

In addition, the defendant complains about these questions asked by the State:

State:          Already you know your son is in the pediatric intensive care unit at Vanderbilt and doctors are working on trying to figure out what's going on and you're not saying anything about what happened, right?

Defendant:     I'm trying to figure out what is the extent of his injuries myself, like how bad is it.

State:          We'll get to that. We'll get to that. But you knew something traumatic happened to your son that might account for why he's in the hospital, correct?

- 26 -

Defendant:   Like on text two, I'm asking her, you know, Why is he in the hospital? What's wrong?

State:   Right. And she's telling you the things that are wrong, correct?

Defendant:   Yes.

State:   Do you tell her that he fell down th[e] stairs with you?

Defendant:   No, she already accused me, I guess, of beating him.

State:   That comes later.

Defendant:   That's why I said why would I ever do anything, that's something I would never do, she know that. She came to me first accusing me of beating my son.

State:   Why did you not at that point in time say "we fell down the stairs?"

Defendant:   I was scared. I should have, that's the single biggest mistake of my life, I should have told her from the beginning.


The defendant additionally finds fault with these questions asked by the State:


State:   Well here you're telling these jurors that you're not the kind of father who would inflict injuries on his baby and yet your son's in the ICU Unit, you're not anywhere around and you're lying through your teeth about what really happened?

Defendant:   I'm not lying through my teeth and I would have been around if her people didn't threaten my life, and I still asked to try to come up there if she would have told me that they wasn't at the hospital, and she knows that I told her that.

State:   Mr. Groves, Ms. Collier is telling you your son has severe head injuries, he's on a breathing machine, he's got seizures,

- 27 -

and you're not saying word one about this so-called fall down the stairs, right?

Defendant: Right.

State: Because it never happened?

Defendant: It happened.

State: Then why not say that to Ms. Collier, to the doctors?

Defendant: I never got to talk to any doctors.

State: Did you pick up the phone and call?

Defendant: I never had—I never had access.

State: What kind of father, Mr. Groves, sits miles away while his kid is in the ICU Unit . . . and doesn't say anything about what may have happened to cause his severe head injury? What kind of father does that?

Defendant: I would say a bad one.

State: Exactly. That very kind of father that would cause these injuries in the first place?

Defendant: No.

State: Mr. Groves, there was only one reason why you didn't say anything about some so-called fall, because it never happened?

Defendant: It happened, that's your opinion.

State: No, Mr. Groves, if it happened that way, there was no reason not to say anything.

Defendant: I was going to say something.

State:        You never did.  Three and a half years later?

Defendant:    No.  It would, if she would have—if I would have got to explain myself the night of my arrest, she would have known, the three times I tried to call from being in jail, she would have known if she would have answered the phone.

State:        Who was treating your baby, Ms. Collier or the doctors?

Defendant:    I would say the doctors.

State:        Was there anything that prevented you from calling the doctors and saying, I had this big fall down the stairs with my son, you better look into that."

Defendant:    Right off the bat I didn't even know what hospital he was at, I just knew he was in the hospital, I didn't know where, I asked her where, and she told me a little while later.

State:        You know, Mr. Groves, you keep coming up with one excuse, one rationalization, one justification after another?

Defendant:    That's not an excuse.

State:        Really?

Defendant:    Not an excuse.

State:        Then what is your excuse for not calling the doctors and telling them what you claim is the truth about what happened to your son?

Defendant:    I was—I wanted to go see my son, I was worried about his welfare.  I wanted her to tell me how he was doing, I wanted to see him, but I never got the chance.

State:        It was more important for you to protect your own skin than to make sure the doctors had the information [that] might help them treat your son, was it not?

- 29 -

Defendant:   That's not accurate all the way.

State:   What part of it is inaccurate?

Defendant:   The only part that I would say that I could have talked to was the detective.

State:   Oh, you could have told the patrol office[r] that arrested you on September 24[], 2010, right?  You could have told the judge at the preliminary hearing on September 29[], 2010?

Defendant:   If [my first attorney] would have let me, yes.

State:   You could have told anybody?

Defendant:   I did.

State:   Anybody in the six weeks before you got arrested about what happened, but you didn't?

Defendant:   I was being falsely accused, I should have, but I didn't, that's my fault, that's the part I got to regret and deal with every[]day that I have been living with and regretting every[]day.  I mean, with all due respect, . . . sir, I came to jail September 24th with a head full of hair, there's not been a day that I didn't regret or didn't hate myself or didn't have anger at myself or resentment towards myself and I stress myself every single day, you know what I'm saying, all my hair [is] gone from that now, I mean, I wrote, I even have letters that I wrote to Ms. Collier that expressing and there in the jail and my pod where I sleep at right now.


Finally, the defendant complains about this line of questioning:

- 30 -

State:          And in all the time before this, through all the opportunities to tell family members, doctors, Ms. Collier, police, that story never was heard, was it?

Defendant:      Just like the story that she told me not to tell the police, family and lawyers about that me and her had been seeing each other and we had sex, so that DHS would possible take [the victim] from her.

We note that at the conclusion of the defendant's redirect examination, the trial court gave the jury the following instruction regarding the defendant's Fifth Amendment right to remain silent:

[T]here were references particularly as it related to the preliminary hearing [and whether] he had told his story to the police officer when he was arrested, obviously under our constitution, a person who is charged with a crime has an absolute right to remain silent, he can give up that right or he could exercise that right, so, to that extent, you're to give no thought or consideration to the fact that he did waive his right and give up his . . . Fifth Amendment [right], but you can otherwise consider his testimony in any manner that you want to consider it along with all the other evidence in this case.

At the hearing on the motion for new trial, defendant's successor counsel argued that trial court erred in allowing the State to cross-examine the defendant regarding his prior invocation of his right to remain silent. In particular, counsel asserted that the court improperly allowed the State to ask the defendant why he had never talked to the police, doctors, and others about his alleged fall with the victim and why he had chosen not to testify about this alleged fall at the preliminary hearing. The State responded that the trial court had made proper rulings regarding this issue. At the conclusion of the motion for new trial hearing, the trial court denied the motion, stating:

I think that line of questioning was appropriate in light of the fact that [the defendant] had already told the jury that this was an accident, I don't think

- 31 -

that telling that story to the mother, the police or the doctors, even though they might be considered agents of the State, really goes to the issue of the Fifth Amendment. It's not an admission of any guilt. He's not implicating himself in any manner whatsoever. I do agree if it extended to the preliminary hearing, that was improper, however, the Court finds that in the context of the overall cross-examination in that regard on his credibility, while it was improper to do that, it's harmless error. I mean, so while I do find [error] as to the preliminary hearing, I still will respectfully deny the motion because I think with the overall evidence that existed and the doctor's testimony that th[ese] w[ere] not accidental injuries, and [the defendant] clearly admit[ting] . . . that he was the only person with the child, simply the jury did not accept his explanation of the events, so I'll respectfully deny the motion.

The defendant contends that the State, after commenting on his right to remain silent by asking the aforementioned questions, compounded this error by arguing during closing that "when [the defendant] learned the police want to talk to him, he blows that off" and "when [the defendant] goes to a preliminary hearing and is confronted with the allegations, he says nothing and doesn't even have his lawyer cross-examine Ms. Collier on the story that he's proposing to you." The defendant further asserts that the State improperly argued during its closing that the he was lying during his testimony about the alleged fall with the victim because "you don't fail to give that story to the mom, to the doctors, when you're asked about what happened, but you come up with a bunch of other false statements instead." Lastly, the defendant claims that the State, during its closing argument, improperly remarked, "Did [the threats the defendant had received from Collier's family] excuse hi[s] not returning the calls of the detective to say what happened?"

Although the defendant acknowledges that the defense counsel did not contemporaneously object at trial to the State's cross-examination questions and closing argument regarding his decision to remain silent about his accidental fall with the victim, he nevertheless asserts that the State's questions and argument amount to plain error. He maintains that because all five factors for plain error are satisfied, this court should grant him relief in the form of a new trial.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at

- 32 -

any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted). It is the defendant's burden to persuade an appellate court that the trial court committed plain error. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

In considering whether the State's questioning rose to the level of plain error, we note that the Fifth Amendment to the United States Constitution, which is applicable to the States through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution provides that "the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Both of these constitutional provisions guarantee criminal defendants the right to remain silent. State v. Jackson, 444 S.W.3d 554, 585 (Tenn. 2014) (citing Carter v. Kentucky, 450 U.S. 288, 305 (1981); Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999)).

In Doyle v. Ohio, 426 U.S. 610, 619 (1976), the United States Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." The Court recognized that a defendant's postarrest silence following Miranda warnings "is insolubly ambiguous" because the Miranda warnings contain an implicit assurance that a defendant's silence will not be used against him and "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights." Id. at 617-18.[2]

---

[2] However, the Supreme Court in Doyle recognized the following:

A few years later, in Jenkins v. Anderson, 447 U.S. 231, 238-40 (1980), the Supreme Court held that the Fifth and Fourteenth Amendments were not violated by the use of a defendant's prearrest silence for impeachment purposes. Specifically, it court held that the Fifth Amendment, as applied to the states by the Fourteenth Amendment, is not violated by the State's use of prearrest silence to impeach a defendant's credibility because such "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." Id. at 238. The court also held that the State's use of prearrest silence to impeach a defendant's credibility does not deny him the fundamental fairness required by the Fourteenth Amendment. Id. at 240. The Supreme Court recognized that "the fundamental unfairness present in Doyle is not present in this case" because "[t]he failure to speak occurred before the petitioner was taken into custody and given Miranda warnings." Id. at 240. However, the court stated that "[o]ur decision today does not force any state court to allow impeachment through the use of prearrest silence" and that "[e]ach jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative th[a]n prejudicial." Id.

Still later, in Fletcher v. Weir, 455 U.S. 603, 606-07 (1982), the United States Supreme Court held that the Constitution does not prohibit the State from using a defendant's postarrest silence for impeachment purposes if the record does not indicate that Miranda warnings were given. Specifically, the Court stated the following:

> In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

---

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

426 U.S. at 619 n. 11.

- 34 -

Id. at 607; see State v. Chris Haire, No. E2000-01636-CCA-R3-CD, 2002 WL 83604, at *15 (Tenn. Crim. App. Jan. 22, 2002) (where a panel of the Tennessee Court of Criminal Appeals concluded that the "patently inconsistent" qualification in Braden v. State, 534 S.W.2d 657, 660-61 (Tenn. 1976), was still viable in the factual context present in Weir and that "the result is that Tennessee restricts impeachment use of a defendant's postarrest silence that precedes Miranda warnings to those situations wherein it is patently or blatantly inconsistent with trial testimony.").

The holdings in Jenkins and Weir were based on the premise that silence prior to arrest or silence after arrest in the absence of Miranda warnings is "probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty." Brecht v. Abrahamson, 507 U.S. 619, 628 (1993) (citing Jenkins, 447 U.S. at 238).

Given the particular circumstances in this case, the defendant has failed to establish that a clear and unequivocal rule of law was breached or that a substantial right of the defendant was adversely affected. Here, the very first time the defendant stated that the victim's injuries were the result of an accidental fall was during his testimony at trial. Consequently, pursuant to Jenkins and Weir, it was both proper and probative for the State to impeach this testimony by emphasizing that the defendant had not told anyone about the accidental fall with the victim before receiving his Miranda warnings. See id. The defendant had an extremely compelling reason, during the approximately seven weeks between the August 5, 2010 incident and his arrest, to offer his explanation for the victim's injuries because this explanation would have cleared his name and helped him avoid criminal charges. See id. We note that even under the more stringent standard espoused in Chris Haire, 2002 WL 83604, at *15, an unpublished case from this court, the State's questions about the defendant's silence during the seven-week period prior to the defendant's arrest would have been proper and the State's questions about the defendant's postarrest silence preceding his Miranda warnings would also have been proper so long as the defendant's silence was "patently or blatantly inconsistent" with his trial testimony. The problem in this case is that there was absolutely no proof offered at trial that the defendant was actually given his Miranda rights at the time of his arrest or any other time or that the defendant relied on his Miranda rights when he remained silent. Cf. State v. Jonathan D. Rosenbalm, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *6 (Tenn. Crim. App. Dec. 9, 2002) (concluding that no error existed because it was the appellant's duty to supply an adequate record for review and there was no indication in the record that the appellant had been informed of his Miranda rights or that he had relied on that advice in remaining silent). Had there been such proof, any comments the State made regarding the defendant's silence after he was given his

Miranda warnings would have violated Doyle on the basis that the defendant could have chosen to stand on his right to remain silent based on the implied assurance that his silence would be used against him at trial. See Doyle, 426 U.S. at 617-18; Brecht, 507 U.S. at 628-629. Because the record does not show that the defendant was ever provided his Miranda rights, thus erasing the pre- and post-Miranda distinction for the purposes of this case, we conclude that the defendant has failed to establish that a clear and unequivocal rule of law was breached or that a substantial right of the defendant was adversely affected. See Brecht, 507 U.S. at 629 ("Under the rationale of Doyle, due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-Miranda silence.").

We also conclude that the defendant has failed to establish that consideration of the error is "necessary to do substantial justice." Initially, we recognize that the State's comments regarding the defendant's post-arrest silence, which were made in the absence of any proof regarding whether the defendant was given his Miranda warnings, were simply "cumulative" to the "the State's extensive and permissible references to [the defendant's] pre[arrest] silence[.]" See id. at 639. We also acknowledge that there was overwhelming evidence of the defendant's guilt presented at trial. The proof established that the victim sustained brain injuries causing developmental delays, conjunctival and retinal hemorrhages in both eyes, bruises on his face and ear, abrasions to his lip and groin area, and patterned linear parallel abrasions on the backs of both of his thighs. Dr. Williams testified that all of the victim's injuries were recent, non-accidental, and were caused by multiple mechanisms. Although the defendant attempted blame the victim's brain injuries on an undocumented incident in July 2010 when Collier's aunt allegedly dropped the victim, the overwhelming evidence established that the victim was in the sole care of the defendant at the time he received all of his injuries. Moreover, while the defendant asserted for the first time at trial that he accidentally fell with the victim down the stairs, the defendant never mentioned this fall to the victim's mother, the medical personnel who were trying to uncover the cause of the victim's injuries in order to properly treat him, or to any members of law enforcement, including Detective Polk, during the approximately seven-week time period between the August 5, 2010 incident and his arrest. Given the overwhelming proof of the defendant's guilt, we feel confident that the jury would have reached the same result, even if the State had not commented on the defendant's postarrest silence. Because the defendant has failed to establish that a clear and unequivocal rule of law was breached, that a substantial right of the defendant was adversely affected, or that consideration of the error is "necessary to do substantial justice," we conclude that the defendant is not entitled to plain error relief on this claim.

**II.    Prosecutorial Misconduct.** The defendant also argues that the State committed prosecutorial misconduct during closing argument by violating the rule that a

prosecutor shall not "express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). The defendant asserts that the State during its closing, "repeatedly called [him] a liar, told the jury that his story was fabricated and false and . . . that the version of facts [he] gave in his testimony should not be trusted[.]" While refusing to concede that the State did not also improperly inflame the passions of the jury and engage in other areas of misconduct, the defendant asserts "it is irrefutable" that the State "engaged in prosecutorial misconduct" when it commented about his truthfulness during closing. Although the defendant acknowledges that the defense failed to object to these comments as they occurred, he nevertheless asserts that the State's remarks during its closing argument and rebuttal closing argument amount to plain error. The State responds that the defendant has waived these issues and cannot satisfy all five factors for plain error relief. Alternatively, the State argues that the jury's decision to acquit the defendant of the aggravated child neglect charges and to convict him of the lesser included offense of child neglect shows that any error in the prosecutor's comments was harmless. We conclude that the defendant is not entitled to plenary review on this issue and that the State's arguments during closing do not rise to the level of plain error.

The defendant references several comments made by the State in its closing. First, the defendant argues that the prosecutor improperly stated that the defendant's version of events were "false stories" and "false explanations [that] do not ring true." The record shows the State made the following comments:

"What explanations do we get? The very explanations that [the defendant offers. "I don't know what happened." Or "The baby fell." Often times the baby fell is a story of falling off of a sofa or a couch, we have a vernacular for that, "the killer couch." [The defendant] is a little more creative, "I fell down the stairs." We'll talk about that in just a moment. But those false stories, those false explanations do not ring true. This child can't even move or crawl and cannot put [himself] in harm[']s way, so saying, number one, "I don't know what happened to the baby" is a lie because a caregiver has to know what occurred. [The defendant] texted with Ms. Collier more than two dozen times while that little baby was in the hospital on a breathing machine, in a PICU with doctors struggling to find out what was going on, to control seizures that were racking his body to figure out just how devastating the injuries were, multiple CT scans, full body x-rays of every bone in his body looking for anything else that might be wrong, and this man, this man who proclaims to love his son, to never do anything, was his own worst enemy.

- 37 -

Second, the defendant challenges the State's remark during closing that it only believed one statement given by the defendant, which was that the defendant admitted that he covered up the marks on the victim's legs so that Collier would not see them. Specifically, the State made the following remarks:

Time and time again [the defendant] lied through his teeth to protect himself. Probably the one truthful statement he made on the witness stand yesterday is the statement that he covered up [the victim]'s legs so that his mother wouldn't see the marks before he left the house.

Third, the defendant argues that the State improperly characterized his explanation for the victim's injuries as "one big whopping story" during its closing. The record shows that the State made the following statements:

Think about the mindset of a person who causes these injuries, puts a baby down to sleep and walks out the door and says nothing. What kind of a father does that? Not the kind of father that [the defendant] claims he is. "I love my son, I would never do anything to harm him." No, he's the kind of father who's more concerned about himself than a little child, he has no idea how devastating the injuries are the moment he walks out the door, but rather than say a word to his mother, who comes in, he offers to take out the trash. Why? To take away the bloody clothes, the bloody sheets, whatever else he was concealing in addition to his crimes. And when he calls her back and his phone breaks off, he doesn't call again. And when he learns the boy is in the hospital, he never shows up. When he learns the police want to talk to him, he blows that off. When he finally gets arrested, he lies about who he is. And when he goes to a preliminary hearing and is confronted with the allegations, he says nothing and doesn't even have his lawyer cross-examine Ms. Collier on the story that he's proposing to you.

Too many injuries, too much indifference and one big whopping story. It's a good one.

Fourth, the defendant complains about the State's comment during closing that he was not "smart enough to put together a story that rings true" and that "lies are a

symphony of chords that are not in harmony." As to this issue, the records shows that the State made the following remarks:

> One of the people [who] trained me was a public defender for the federal public defendant's office in Chicago, Illinois. He gave a lecture on cross-examination and he said that the essence of cross-examination is a term called verisimilitude, it's a beautiful word, verisimilitude, some of you may know it, others of you may not. But the dictionary definition of verisimilitude is this, it is "the quality or appearance of being real or true, quality or appearance of being real or true." And this lawyer said that the goal of cross-examination, indeed the goal of jurors in assessing credibility, is to assess verisimilitude, quality or appearance of being true or real, or to put it in similar terms, the way things really happen.

> [The defendant] thinks, he's arrogant enough to believe that he can persuade you, convince you of the verisimilitude of his story, but [the defendant] isn't smart enough to put together a story that rings true. There's a phrase, "truth has a ring of its own" that we hear from the point in time that we're children. I offer you a variation on that theme, that truth has a ring of its own and lies are a symphony of c[h]ords that are not in harmony.

Fifth, the defendant asserts that the State compounded its previous improper comments when it stated the following:

> [S]o how do we know that [the defendant's] story is false? Well, the first and obvious reason is, if this is truly an accident, you don't sit on that story for three and a half years while you wait in jail for your trial to come up, that's just common sense, nobody does that.

Sixth, the defendant argues that the State improperly reiterated its belief that the defendant's testimony was false when it stated the following:

> This baby has brain injury that's so severe that when he gets brought into the emergency room, they're putting a breathing tube down, they're

having to feed him through a tube, he doesn't have alertness and consciousness, he's seizing, and yet [the defendant] wants you to believe that for an hour to an hour and a half after this devastating fall down the stairs, the baby's crying, alert, awake, conscious, involved, seemingly just fine except for a busted lip, nonsense.

Seventh, the defendant contends that the State improperly asserted that he lied and inappropriately recounted the story of the boy who cried wolf. The record shows the State made the following comments:

[The defendant,] who's lied and lied and lied and lied and lied some more[,] is calling Ms. Collier a liar. Well[,] don't you know if Ms. Collier had given dozens of inconsistent statements like [the defendant] did, his lawyer would have been pointing out those things in her cross-examination.

Perhaps when [the victim] is old enough to understand the concept, his mother will teach him the parable of a little boy or little girl who cries wolf, we're all familiar with that story; if we lie, we don't get believed. If we have a history of lying, people won't accept what we have to say. And [the defendant] walks into this courtroom hoping that you will accept what he has to say even though it doesn't have the quality or appearance of any truth whatsoever . . . .

In addition to complaining about the State's previous remarks, the defendant also maintains that the State made several improper comments during its rebuttal closing argument that amounted to prosecutorial misconduct. The defendant asserts that the State injected its personal opinions and beliefs about the defendant's guilt when it stated the following:

In a few moments, Judge is going to tell you reasonable doubt is a finding of doubt that results from an investigation of all the proof in this case and an inability after the investigation [t]o let your mind rest easily as to the certainty of guilt. Absolute certainty is not demanded by the law to convict of the charge, but moral certainty is required. The essence of that is that you have to feel in you[r] hearts and you[r] minds that you have made the right decision, that's an easy call in this case.

[Defense counsel] suggests to you that truth is stranger than fiction. Well reasonable doubt is not predicated on hypothesis and speculation and one story after another and this theory and that theory, and her assertions and [the defendant's] lies; it's based on the evidence and it's based on your common sense.

The defendant also asserts that the State continued to repeatedly call him a liar during its rebuttal closing:

[Defense counsel] tells you different injuries, different people, different days, all an accident, really? Is that the evidence you heard in this case? First of all, the only person who claims there's ever been a prior fall is him, The liar. Ms. [Collier], no other witness, no other proof corroborates this so-called fall, that the aunt dropped the baby weeks before, that doesn't explain anything. . . .

We have to prove that it happened other than by accidental means. Did you hear anybody in this courtroom say these injuries are consistent with accidental trauma? The only expert witness you heard on the witness stand says these are non-accidental injuries, inflicted injuries, child abuse, multiple mechanisms, multiple injuries, multiple traumas to produce, not an accident. No conceivable explanation of accident to account, the only person who makes that claim is [the defendant], the liar.

Finally, the defendant argues that the State improperly claimed during its rebuttal closing argument that he testified untruthfully to avoid punishment and that he must now face the consequences for his lies. As to this issue, the record shows the State made the following comments:

Boy, [the defendant] was afraid of an awful lot of things that month, [e]xcept the one thing he should have feared most was what's going to happen to his baby in that hospital and what can I do to change that? And here today [the defendant] fears the ultimate consequence for his conduct, a conviction, and the consequences that flow, and so he's going to do this one

- 41 -

thing that he's done every time he's been in fear, he's gonna lie to get out of trouble.

What's happened is a tragedy for everybody involved. There's only one person that's going to live with the permanent brain injury and that's [the victim]. There's only one parent that's ever going to care for that child as he goes through his development and has to overcome those difficulties created by this man's conduct, and that's his mother. And the one tragedy is not shared by [the defendant], he made his bed, he made his lies, and now he must live with his consequences.

The Tennessee Supreme Court has consistently held that "'closing argument is a valuable privilege that should not be unduly restricted.'" State v. Reid, 164 S.W.3d 286, 320 (Tenn. 2005) (quoting State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)); see State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Closing argument gives each party an opportunity to persuade the jury of their theory of the case, see 11 David L. Raybin, Tennessee Practice, Criminal Practice and Procedure § 29.2, and to highlight the strengths and weaknesses in the proof for the jury, see State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008) (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." Banks, 271 S.W.3d at 131 (citations omitted). We also recognize that "[c]losing arguments in criminal cases have a 'rough and tumble quality' about them, State v. Skakel, 276 Conn. 633, 888 A.2d 985, 1060-61 (2006), because they are traditionally the one place in the trial where the lawyers are given the greatest leeway in their manner of expression." Banks, 271 S.W.3d at 131 (citing 6 Wayne R. LaFave et al., Criminal Procedure § 24.7(b), at 456-57 (3d ed. 2007)). Notwithstanding this leeway, a prosecutor's comments during closing argument must be "'temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law.'" State v. Johnson, 401 S.W.3d 1, 20 (Tenn. 2013) (quoting State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999)).

Here, the defendant specifically contends that the State, by making the aforementioned remarks during its closing arguments, violated the rule that a prosecutor shall not "express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." Goltz, 111 S.W.3d at 6. The Tennessee

Supreme Court has recognized that a defendant's failure to object to a prosecutor's comments during closing argument rarely results in a reversal of the conviction:

> Unobjected to closing arguments warrant reversal only in exceptional circumstances. United States v. Smith, 508 F.3d 861, 864 (8th Cir. 2007). Accordingly, like the United States Court of Appeals for the Eighth Circuit, "[w]e bear in mind that fleeting comments that passed without objection during the rough and tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers." United States v. Mullins, 446 F.3d at 758.

Banks, 271 S.W.3d at 132 n.30.

Here, the record clearly shows the defense failed to make any contemporaneous objections to the aforementioned comments and failed to include this issue in the motion for new trial. Accordingly, the defendant has waived plenary review of this claim, and we may only review these issues for plain error. See Tenn. R. App. P. 36(a), (b); Tenn. R. App. P. 3(e) (stating that in all cases tried by a jury, no issue presented for review shall be predicated upon misconduct of the parties committed during the trial of the case unless the same was specifically included in a motion for new trial); see also State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005) ("[W]here a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute 'plain error.'"); State v. Pack, 421 S.W.3d 629, 648 (Tenn. Crim. App. 2013) (holding that because the defendant failed to make a contemporaneous objection during closing arguments, he not only had to establish that the comments were improper but also that they constituted plain error).

Without question, the State's numerous statements that the defendant was a "liar" who provided "false explanations" for the victim's injuries at trial would have constituted prosecutorial misconduct under plenary review. However, as we previously recognized, we must review this issue for plain error, and we are constrained to conclude that, in light of the overwhelming evidence of guilt presented at trial, the defendant has failed to show that consideration of the error is "necessary to do substantial justice." See Smith, 24 S.W.3d at 282. The proof established that the victim, while in the care of the defendant, sustained brain injuries, conjunctival and retinal hemorrhages in both eyes, bruises on his face and ear, abrasions to his lip and groin area, and patterned lineal abrasions on the

- 43 -

back of both legs. Dr. Williams testified that the victim's injuries were recent, non-accidental in nature, and were caused by different mechanisms. Although the defendant presented the defense theory at trial that the victim's injuries were caused when he accidentally fell down the stairs while holding the victim, the jury rejected this defense when it convicted him of two counts of aggravated child abuse and one count of child neglect. Because the defendant has failed to establish all five factors required for plain error, he is not entitled to relief on this issue. See id. at 283.

**III. Sufficiency of the Evidence.** Lastly, the defendant argues that the evidence is insufficient to sustain his convictions. The State responds that it was the jury's prerogative to reject the defendant's claim regarding the accidental fall and that the evidence is sufficient to support the defendant's convictions. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When

considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**A. Aggravated Child Abuse.** Regarding his two convictions for aggravated child abuse, the defendant argues the State failed to prove beyond a reasonable doubt that he "inflicted the injuries to [the victim] either with a dangerous instrumentality or other than by accidental means." He asserts that the State's witnesses, who opined that the victim's injuries came from non-accidental trauma, could not identify what instrumentality, if any, was used to inflict the victim's injuries. He also contends that his own trial testimony regarding the accidental fall with the victim "provided a plausible explanation for the [victim's] injuries" and "defeated the State's ability to claim that a reasonable trier of fact could find him guilty beyond a reasonable doubt."

Code section 39-15-402 defines the offense of aggravated child abuse:

(a) A person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a) . . . and:

(1) The act of abuse . . . results in serious bodily injury to the child;

(2) A deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse . . . ;

. . . .

. . . .

. . . .

(d) "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

(e) A "dangerous instrumentality" is any item that, in the manner of its use or intended use as applied to a child, is capable of producing serious bodily injury to a child, as serious bodily injury to a child is defined in this section.

Tenn. Code Ann. § 39-15-402(a), (c), (d) (Supp. 2009). In addition, Code section 39-15-401 defines the offense of child abuse:

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony.

Id. § 39-15-401(a) (Supp. 2009). "A person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Id. § 39-11-106(a)(20) (Supp. 2009). The record shows that the defendant was convicted of Count 1, which charged him with aggravated child abuse resulting in serious bodily injury to the child and was convicted of Count 2, which charged him with aggravated child abuse where a deadly weapon or dangerous instrumentality is used to accomplish the act of abuse.

First, we consider the defendant's assertion that the State failed to prove that he knowingly, other than by accidental means, treated the victim in such as manner as to inflict injury, which applies to both of his aggravated child abuse convictions. The proof at trial established that the victim sustained brain injuries causing developmental delays, conjunctival and retinal hemorrhages in both eyes, bruises on his face and ear, abrasions to his lip and groin area, and patterned linear parallel abrasions on the backs of both of his legs. Dr. Williams testified that all of the victim's injuries were recent and non-accidental. He also opined that the injuries to the victim's legs and groin area were independent and separate from the injuries to the victim's head and that he could not conceive of a mechanism whereby the victim would have sustained all of these injuries from a single incident. Dr. Williams also stated that he was unable to think of a non-inflicted mechanism that was capable of producing the number and variety of injuries to the different areas of the victim's body. Although the defendant attempted blame to victim's injuries on an undocumented incident a month earlier when Collier's aunt dropped the victim, the overwhelming evidence showed that the victim was in the sole care of the defendant at the time he received all of his injuries. In addition, while the defendant asserted for the first time at trial that he accidentally fell down the stairs while holding the victim, the defendant never mentioned this fall to the victim's mother, the medical personnel who were trying to uncover the cause of the victim's injuries in order

- 46 -

to properly treat him, or to any members of law enforcement during the approximately seven weeks between the August 5, 2010 incident and his arrest. The jury, by its guilty verdicts, rejected the defendant's claim about the accidental fall and accredited the witnesses for the State. As we noted, this court does not re-weigh the evidence or substitute its inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297. Given the evidence presented at trial, a rational jury could have determined that the defendant knowingly, other than by accidental means, treated the victim in such a manner as to inflict injury.

Next, we turn to the defendant's claim that the State failed to prove beyond a reasonable doubt that he used a dangerous instrumentality to inflict the victim's injuries. He asserts that the State's witnesses could not identify what instrumentality, if any, was used to inflict the victim's injuries. At trial, Collier testified that although the defendant claimed the victim's injuries were caused by his highchair, the victim had never before been injured by sitting in his highchair. Collier noted that before the defendant left her home on August 5, 2010, he took out her trash, even though he had never taken out her trash before, which raised the inference that the victim was disposing of the item of items he used to cause the victim's serious injuries. Dr. Williams testified that the victim had "patterned linear parallel abrasions" on the backs of both of his thighs. He opined that "something that was linear in nature . . . struck the [victim]" because the injuries were "fairly thin, so something, some type of thin object . . . had a forceful impact on the [victim]'s leg." Dr. Williams opined that while these injuries could have been caused by a coat hanger, extension cord, or the edge of a ruler, they could not have been caused by a highchair. Based on this proof, a rational jury could have determined that the defendant used a dangerous instrumentality to inflict the victim's injuries. Accordingly, we conclude that the evidence is sufficient to sustain both of the defendant's convictions for aggravated child abuse.

**B.  Child Neglect.**  The defendant also contends that the State failed to present sufficient evidence that he knowingly neglected the victim or that his neglect adversely affected the victim's health and welfare. He references his own testimony that the victim, while upset immediately after the fall, did not have any outward signs of injury and eventually calmed down and fell asleep prior to Collier returning home. The defendant claims that because he was "unaware that the injuries [the victim] sustained due to the fall were of such a critical nature that immediate medical attention was necessary," he did not knowingly neglect the victim's welfare by failing to seek medical attention. The defendant also contends that the State failed to prove how any act, or failure to act, on his part led to additional injuries to the victim. He claims that Dr. Williams "did not offer proof as to how [the defendant's] alleged neglectful conduct led to additional injuries to [the victim] in addition to injuries allegedly sustained by the initial causal conduct." The

- 47 -

defendant adds that "[a]bsent such proof, the State has failed to prove how [his] conduct, even if it had amounted to negligence, . . . caused serious bodily injury to [the victim] in its own right."

Code section 39-15-401(b) defines the offense of child neglect:

> Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

Id. § 39-15-401(b) (Supp. 2009). Once again, a person acts "knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Id. § 39-11-106(a)(20) (Supp. 2009).

The jury in this case heard proof that the defendant, knowing that victim was injured, failed to immediately contact the mother or seek medical assistance for the victim. Collier testified that the defendant never indicated that the victim had any injuries before he left her home on August 5, 2010. She said that fifteen minutes after the defendant left, he left her a partial voicemail indicating that something had happened to the victim while in his highchair. Collier stated that if she had not received this partial voicemail from the defendant, the victim would have died from his extensive injuries. In addition, the defendant testified that he never sought medical attention for the victim after he realized the victim was injured. Based on this proof, a rational jury could have determined that the defendant knowingly neglected the victim and that this neglect adversely affected the victim's health and welfare. Accordingly, we conclude that the evidence is sufficient to sustain the defendant's conviction for child neglect.

**C. Criminal Impersonation.** Finally, the defendant argues that the evidence is insufficient to sustain his conviction for criminal impersonation. However, the record clearly shows that the defendant entered a guilty plea to the criminal impersonation charge. A defendant does not have an appeal of right to challenge the sufficiency of the evidence when he enters a guilty plea to a charge and fails to reserve a certified question of law. See Tenn. R. App. P. 3; Tenn. R. Crim. P. 37(b). Accordingly, we lack jurisdiction of this portion of the defendant's appeal.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court in Counts 1, 2, and 3; however, because the record shows that the defendant entered a guilty plea to the criminal impersonation charge in Count 4, we dismiss for lack of jurisdiction the portion of the defendant's appeal challenging the sufficiency of the evidence supporting that conviction.

_____
CAMILLE R. MCMULLEN, JUDGE